WILLIAM E. VANBUSKIRK et al., complainants-respondents,

*v.*

STANDARD OIL COMPANY (NEW JERSEY), defendant-
appellant.

[Argued May 25th, 1926.    Decided October 18th, 1926.]

Descendants, children and grandchildren of J. VanB., Jr., filed a
bill in the court of chancery to enforce an alleged right of visita-
tion to a family burial plot and for other relief. J. VanB., Jr., had
deeded or attempted to deed said plot to the defendant in 1905. At
that time, by agreement with defendant, the bodies of his ancestors
and relatives, and other bodies buried therein, were removed. The
tombstones were removed. The family vault disappeared. The fence
was obliterated. Sand and dirt drifted over the plot until it bore no
resemblance to a cemetery. The complainants were unable to show
that the body of any ancestor or relative remained in the plot. *Held*,
that the court of chancery, erred in making a decree granting the
prayer of the complainant's bill because the evidence showed that the
cemetery had been abandoned and that the complainants were in
laches.

---

On appeal from a decree of the court of chancery advised
by Vice-Chancellor Fielder, whose opinion is reported in *94
N. J. Eq. 686*.

*Mr. Robert Carey,* for the defendant-appellant.

*Mr. Aaron A. Melniker,* for the complainants-respondents.

The opinion of the court was delivered by

KATZENBACH, J.

This is an appeal from a final decree of the court of chancery. The appellant, Standard Oil Company (New Jersey) (hereinafter referred to as the defendant), was the defendant below. The bill of complaint was filed by children and grandchildren of John VanBuskirk, Jr. (hereinafter referred to as the complainants). The purpose of the bill was to enjoin the defendant from removing from a cemetery plot the remains of those buried there or from disturbing the same or in any way desecrating or destroying the cemetery or any of the graves therein, and to restrain the defendant from interfering with the access by the complainants to the cemetery, and to obtain a right of way for the complainants over the defendant's lands to said cemetery.

In order to comprehend the situation presented by the bill of complaint it is necessary to state briefly a portion of the history of the VanBuskirk family and the changes which took place in a tract of land at Constable Hook, in the county of Hudson, formerly owned by the family, of which the cemetery plot mentioned was a part. No more correct statement of the history of the family with reference to the cemetery can be given than that made by the learned vice-chancellor who heard the case below. His statement is as follows: "James VanBuskirk, whose will was probated December 27th, 1823, died seized of a large tract of land situate at Constable Hook, in what is now the city of Bayonne, on which he resided. Included within his homestead lot, and a few hundred feet from his mansion house, was the Van-Boskirk family burial ground, about an acre in extent. By his will, dated September 8th, 1823, he devised all his real estate, with the exception 'of the burying ground as it is now enclosed,' and excepting, also, other described real property, to his three sons, John, Nicholas and James, upon condition that no part thereof should be sold by them, but should be divided amongst their children at the time and in the manner they might deem fit. He designated how the real estate

devised to his three sons should be divided, giving to his son John and to his heirs forever the homestead lot of forty acres, making no mention of the burial ground other than in the exception quoted. The other real estate excepted from the devise to his three sons was devised to his daughter, Ann. He left him surviving his said three sons and daughter.

"John VanBuskirk [son of James], who had changed the spelling of his surname, executed and delivered to his son John VanBuskirk, Jr., a deed dated March 20th, 1864, recorded July 20th, 1864, in which he recited the will of his father and the devise thereby of all of said testator's real estate, with the exception 'of the burying ground as it is now enclosed,' and excepting, also, certain other real estate, to his sons, John, Nicholas and James, upon the condition above set out, and further reciting the intention of the grantor, John VanBuskirk, by his deed to convey the land thereinafter described, to his son, John VanBuskirk, Jr., in part as his portion according to the power given in the will of James VanBoskerk, and then the grantor proceeded to convey to his son, John, Jr., a tract of land within whose boundaries the burial ground was located, without further reference to said burial ground.

"John VanBuskirk [son of James VanBoskerk] died in or about the year 1869, leaving a will dated July 25th, 1864, by which he devised to his said son, John VanBuskirk, Jr., the said homestead lot of forty acres [all or the major part of which he had conveyed to said son by the deed above mentioned] without referring in the description thereof to said burial ground. He added, as the final clause of his will, the following:

" 'It is my wish, and I hereby order, that the burial ground at Constable Hook, adjoining said homestead, shall not be disturbed in any manner, nor used for any purpose whatever, except for sepulchre only.' "

John VanBuskirk, Jr., died in the year 1920. Between the years 1864 and 1900 a great change took place in the commmunity in which the VanBuskirk property was located.

The property during this period was found suitable, by reason of its proximity to navigable waters and large centers of population, for industrial purposes. The city of Bayonne sprang into existence. Corporations purchased lands in the locality and built upon them large manufacturing and industrial plants. Railroads were extended to afford better transportation facilities. The VanBuskirk family surrendered to the changed conditions. It moved from the old manor house and made its abode in a home located a short distance from it. The new home became, in a relatively short time, unlivable by reason of the location of new industries and the expansion of the old. John VanBuskirk, Jr., moved to Connecticut in the year 1889. He soon thereafter conveyed his real estate holdings at Constable Hook to the defendant, with the exception of the cemetery plot.

The history of the cemetery plot is a replica of the homestead. It originally was fenced and contained a vault used by the VanBuskirk family. There is some evidence in the record that other families residing in the vicinity had used it for interments. The last interment in the cemetery was made in 1886. The remains of the wife of John VanBuskirk, Jr., were in that year placed in the vault in the cemetery. It was in 1890 thought to be an unsuitable resting place for her body, which was removed to a cemetery on Staten Island. From this date the VanBuskirks' burial plot continued to remain unvisited, dilapidated, and uncared for. This condition continued for a period of fifteen years. On May 8th, 1905, John VanBuskirk, Jr., conveyed the burial ground to Charles W. Fuller by the following description:

"All and singular the land used and employed for the purpose of sepulchre, and which land and premises are contained in block 256 on map above referred to, and known as 'old cemetery,' and containing one acre of land, be the same more or less."

Charles W. Fuller was the attorney of the defendant. Subsequently, on November 1st, 1905, Fuller conveyed by the same description to the defendant. Prior to the transfer by John VanBuskirk, Jr., to Fuller an agreement had been en-

tered into between them by which VanBuskirk agreed to remove from the cemetery all the bodies of his deceased ancestors and relatives. This agreement was executed. The bodies of his ancestors, including his father and mother, and relatives were removed. Most of the bodies were re-interred in the cemetery on Staten Island. At the hearing it was shown that the tombstones in the burial plot had been removed. The VanBuskirk family vault no longer existed. Sand and dirt had blown over the plot. The fence had disappeared. The plot bore no recemblance to a cemetery. The plot is surrounded by the lands of the defendant. The streets leading to it have long since been vacated by municipal action of the city of Bayonne. Access to the section was cut off in 1900 by the projection across it of a line of railroad of the Lehigh Valley system. No more unsuitable place for the interment of the dead can be imagined. The complainants, at the hearing, produced a piece of a tombstone found in the lot, and several bones which an expert in human anatomy seemed unwilling to testify were human bones. The bones were not admitted in evidence.

The decree made by the court of chancery provides—*first,* that the plot in question is subject to the provisions of the will of John VanBuskirk, dated July 25th, 1864, and shall not be disturbed in any manner nor used for any other purpose except for sepulchre; *second,* that all descendants of John VanBuskirk have the right to visit the same, and care for, and protect the graves of those interred therein, and for such purpose are entitled to free ingress and egress over the defendant's lands surrounding the same; *third,* that the matter of a proper and convenient right of way shall be referred to a special master for his report.

From this decree the defendant appeals. It urges four grounds for reversal. We deem it unnecessary to consider the ground advanced that a dedication for private burial purposes is void because it creates a perpetuity for a non-charitable purpose, and the further ground that the defendant is the owner in fee, freed from any trust, respecting the plot in question. We feel that the case can be disposed of by the

consideration of the question as to whether the complainants have a standing in the court of chancery to obtain the relief for which they asked and which by the decree they have, apparently, obtained.

The complainants base their standing for what they seek upon the right of visitation. They have no title to the plot in question. If their ancestor, John VanBuskirk, Jr., had any title thereto he parted with it by his deed to Fuller, made in 1905. If there is no cemetery there is, of course, no right of visitation. We are of the opinion that no cemetery has existed since the year 1905. If not abandoned prior to that date, it was then abandoned by the removal of all of the bodies of the ancestors and relatives of the complainants buried there, so far as the evidence discloses. At the time of the filing of the bill in this case no vestige of a cemetery remained. We are not, by so holding, placing our approval upon what was done. On the other hand, one only has to refer to the various legislative enactments grouped in the compiled statutes under the title "Cemeteries," to see that the law recognizes that changes in the surroundings of burial grounds are likely to take place, and that such plots may become unused, uncared for, dangerous to the public health, and public nuisances. Under such circumstances provision is made for the removal of the bodies, and former burial plots may become recreation centers or used for other purposes. In 1905 John VanBurkirk, Jr., because of having removed from the neighborhood many years before, probably realized that the time had come when it was better to abandon the family cemetery and have removed the bodies of his ancestors and relatives. It is at least more charitable to credit him with this resolution than to think he was actuated in what he did by motives purely sordid. Whatever was the motive we think the evidence fully justifies us in holding that at the time of the filing of this bill the former burial plot had been abandoned and had ceased to exist for sepulchre purposes. The complainants, therefore, had no right of visitation. Without right of visitation on the part of the complainants the court of chancery could not decree that the complainants

were entitled to ingress and egress to the former burial plot over the defendant's lands.

This view leads necessarily to a reversal of the decree below.

There is, however, another feature of the case which we think bars the complainants from the relief prayed for. This is the laches of the complainants. The children of John VanBuskirk, Jr., have all reached middle life. Some have entered the winter of life. Their mother died forty years ago. They knew and testified regarding the changed conditions surrounding the homestead property. They knew that the body of their mother had been removed from the burial plot in 1890; that the last interment in the plot was in 1886; that their father had had removed in 1905 the bodies of their ancestors and relatives, and that he had sold or attempted to sell the property to the defendant in that year. Some of the complainants had not visited the place for over thirty years. None of them had made any effort to care for it. The grandchildren who are complainants took no interest in the matter. They all waited before seeking any relief until the burial plot bore no resemblance to a cemetery. They remained quiet until John VanBuskirk, Jr., their father or grandfather, had died. In the meantime Mr. Fuller, who was the attorney for the defendant and had conducted the negotiations with John VanBuskirk, Jr., had died. Equity discourages attempts to enforce claims where parties have for many years slept upon their alleged rights. The facts of the present case make, it seems to us, a clear case of laches on the part of the complainants.

The decree below is reversed, to the end that a decree may be entered dismissing the complainants' bill.

MINTURN, J. (dissenting).

The inexplicable desire of men, to possess things regardless of their title and practical utility has led to various phases of novel litigation, furnishing unique legal situations, such as the extraordinary scene in the regal court of Solomon, concerning the ownership of a child, and the abnormal craving of the money changer, in the ducal court of Venice, whose

sole claim to judgment rested in the abnormal satisfaction
of possession, as evidenced thus—

> "You'll ask me why I rather chose to have
> A weight of carrion flesh than to receive
> Three thousand ducats? I'll not answer that,
> But say it is my humour."

In like manner the events herein recorded naturally sug-
gest the inquiry why an ancient cemetery coeval with the
colonization of the county should devolve under a claim of
title into the hands of a jovial disciple of Justinian, who,
unlike Gray in his eloquent elegy, entertained no sentimental
attachment for the place, and unlike its lowly and silent
occupants was not likely to make it his final habitat:

About the period when the advent of the Pilgrims made
Plymouth rock famous, another band of Pilgrims from the
Netherlands settled the island of New Amsterdam. Among
them was Lorenz VanBoskerck, who, with a few followers,
crossed Hudson's river and settled at Constable's Hoeck,
adjoining Paulus Hoeck, which eventually was to develop
into the present city of Bayonne, upon the banks of the
Kill Von Kull.

A necessary adjunct to the bouerie or farm of those days
was a cemetery, many of which still linger, to remind us of
the custom wherein were interred not only the immediate
family of the patroon or settler, but also his relatives, ser-
vants and neighbors, so that the plot in the course of time
served as a community graveyard. Thus it happened that
the plot in question contained a gravestone inscribed in 1732
to the memory of Peter VanBuskirk, and at the time of the
transfer of the cemetery to its juridical grantee contained
between two and three hundred promiscuous graves, besides
headstones and a family vault, indicating its general use as
a community cemetery. To emphasize this use, as it were,
the plot was generally designated in the public records and
popularly as "the old cemetery," its use as such manifestly
extending into the colonial past, for a period at least of one
hundred and fifty years.

So careful were the descendants of the early burghers to preserve the sanctity of its character that James VanBuskirk, in 1823, in his last will, devising all his real estate to his three sons, specifically excepted from the devise "the burying ground as it is now enclosed." So, also, John, one of the devisees, in executing a conveyance in 1864 to his son, John, Jr., made a similar reservation; and thereafter, in the same year when he executed his last will, in devising the family homestead to the same son, he provided:

"It is my wish and I hereby order that the burial ground at Constable Hook, adjoining said homestead, shall not be disturbed in any manner, nor used for any purpose whatever, except for sepulchre only."

And so, through the various generations of the VanBuskirk family, we have an effectual dedication of the plot first by actual practical location and continuous use, and secondly by testament and grant, thus effectuating the donor's intent in an indubitable legal manner, and the validity and indistructibility of the concession for any other than the use thus effectuated. *Trustees of Methodist Church* v. *Hoboken, 33 N. J. Law 13.*

In 1905, however, the commercial impetus of the times was sufficiently potent to induce John, Jr., to attempt a conveyance of this sanctified plot to Colonel Charles W. Fuller, a legal representative of the defendant company, by the following description, which left no doubt that the grantee at least was fully informed of the dedicated character of the *locus in quo, i. e.,* "the land used and employed for the purpose of sepulchre, and known as 'Old Cemetery,' containing one acre of land be the same more or less."

The colonel lost no time in dismantling the cemetery, for by arrangement with his grantor some of the immediate VanBuskirk relatives were removed to the Moravian Cemetery, at Staten Island, but many of the remains were undisturbed and still repose in the ancient plot. The rustic fence, the head stones, and the ancient vaults were removed, and when some of the complainants, shortly before the hear-

ing, visited the plot, the only discernible evidence which remained of "God's acre" consisted of some stray bones which apparently in the hurried work of exhumation had been lost or overlooked.

But the colonel did more—for, realizing that the vacation of the streets and roads leading to the plot would be necessary for the practical use of the *locus in quo,* as a commercial asset, the governing body of the municipality was induced to pass the necessary legislation to that effect, and the public entrances and exits to and from the cemetery were thus obliterated.

The graves of the unexhumed dead presumably still remain intact, but no method apparently has been provided for their identification, so that their graves, like that of Moses upon Mount Nebo, "no man knows to this day." To obtain access to the plot permission must be obtained from the defendant, since the rustic fence is now replaced by a high wall, enclosing huge circular oil tanks, standing like grim sentinels of the new order, overlooking and guarding the discarded relics of the old; and thus—

> "Glory guards with solemn round
> The bivouac of the dead."

In this work, it is suggested that Colonel Fuller did not represent the defendant. Perhaps not; and yet, in the final analysis, it is a matter of no consequence, since defendant's title is based upon this legally abnormal procedure, and can rise no higher in legal validity than the source from which it emanates. He who writes these lines, in common with other members of the court, knew the colonel. Like Yorick, "a fellow of infinite jest and most excellent fancy." Debonair to a marked degree, and possessed of that rare attribute of human fellowship which the proverbial Celt happily terms "the milk of human kindness." A veteran of the military service, possessing the carriage and poise of a gallant moustache of the revolution, combined with the abandon of a gay boulevardier; a keen observer of humanity, as well as of law and legislation, he, like Cassius, was able to look "quite

through the deeds of men;" learned in the law, as well as in the progress of political science, he became with the years invaluable to any great business interest with which he might be identified, and withal and because of those amiable qualifications and characteristics, he would be the last man among the brethren whom one would select to perform the sad offices of a mortuarian, or to assume the morbid status of landlord of a cemetery.

The complainants, heirs of the old family, desire to enter the plot without defendant's permission, and to that end seek by their bill in chancery to set aside and annul the conveyance to the colonel, upon the legal theory that since its dedication was effectuated, it is no longer in the hands of the living, but like an ancient sanctuary, remains in mortmain. The learned vice-chancellor so adjudged, vividly holding against the defendant's charge of adverse possession and abandonment, that "the dead hold adversely to the living," and that the cemetery therefore was incapable of disposal by grant.

One marvels why, when streets and highways were legally vacated, the same legal *modus operandi* was not applied to the vacating of the cemetery plot, in the name of the municipality, as prosecutor *pro bono publico,* instead of adopting the private method of trade and barter, exhibited by the record. No question can be made that in virtue of a public demand for public reasons this cemetery might be condemned and vacated under public auspices, but the doctrine is entirely novel that a dedicated cemetery in practical use by the public, may be sold at private sale, as other real estate, for private commercial uses, and the cemetery in that manner vacated, and its silent occupants thus remitted to the cold charity and unsentimental mercy of the trader.

The adjudications cited by learned counsel to sustain this novel contention are all to the effect that for the public interest, and in the name of the public, a cemetery may be vacated under prescribed legislative provisions, and police protection, but no case is cited going the length required to support the situation presented here. The case of *Newark*

v. *Stockton,* in this court, *44 N. J. Eq. 179,* lends no support to the procedure herein adopted. Per *contra,* the learned Chief-Justice Beasley, with that conspicuous acumen which dominated all his pronouncements, emphasizes the distinction existing between a public and a private prosecutor in this class of cases, and observes as dispositive of that case, "the supervening and single question is whether such use [cemetery] can be abrogated by legislative action, and the lands appropriated to other public purposes."

Since that period (1887), statutes have been enacted authorizing such public action for public uses; but no statute is cited which allows or sanctions the unique procedure here adopted; and decisions of the courts in various jurisdictions may be cited, supporting the public as distinguished from the private right to such condemnation and change of public use.

Learned counsel for the defense, however, evidently sensed this difficulty, and perceiving the legal impasse, assumes the broad and liberal contention as the basis and rationale of his claim that "in regard to the abandonment of cemeteries generally, there has been a complete change in recent years in the opinions of the courts of this country, due primarily to the change in our economic and social life." While we must concede the correctness of this contention as applied to the public right, upon the basic principle *salus populi suprema est lex,* yet, manifestly, such a contention has no relevancy or application to the case of a private demand for private uses. Startlingly novel, however, is its invocation in this instance, by a prominant industrial corporation, since upon its economic correctness is based the substance of the philosophy of Karl Marx, and his disciples of the modern school of socialistic thought, *i. e.,* that the religious, legal, political, social and mercantile institutions of mankind are the result of and are regulated and controlled by the economic changes or determination of history, and not by any prehistoric dispensations of an omnipotent and omniscient Deity. Advocates of almost every religious denomination have inveighed against the correctness of this philosophic teaching, while

modern business and social life have to a marked degree supported the opposition of the clergy. To have this philosophy now urged upon the court, as the basis of a mercantile claim by one of the largest and most progressive business enterprises of modern history, is at least a serious concession to the doctrine underlying all economic radical thought, but like a leap in the dark it was probably injected into the controversy as *argumentum ab inconvenienti,* without realizing the magnitude of its portent.

The inquiry is finally urged, what use can a small cemetery serve, situated as is this, in the midst of a vast industrial development, environed by towering oil tanks, casting their secretive shadows upon the lonely buried dead, like historic pyramids reared upon the shifting sands of dead and forgotten empires.

In this material age, when the spiritual and ethical elements of mankind become negligible in the insatiable mania for the inordinate accumulation of wealth, such an inquiry is not inappropos and one may indeed pardonably ask *cui bono?* It may be a sufficient though sentimental answer to suggest that the founders of the community, the colonial dead who stood at the cradle of the infant state, and ministered to its distressful needs, there repose in studied neglect, and guarded obscurity, when willing hands and grateful hearts might rear a fitting testimonial to their memory.

But there is another answer, and to those who are not entirely "of the earth earthy," it furnishes a satisfactory solution to the inquiry. To those who, rising above the mercenary spirit of the age, extend their vision beyond the stars; who visualize a world which saw its genesis in a march of material evolution that progresses indefinitely to a spiritual consummation, comprehending the ideal, the harmonious and the perfect; who yearn—

> "For the touch of a vanished hand,
> And the sound of a voice that is still."

who in the midst of the noisy turmoil, and nerve-wrecking excitement of the busy city, seek momentary pause, peace-

ful introspection and rest for the weary soul, in the placid environment of "God's acre," there find also a consoling medium which reaches the harmonies of the eternal.

Like a solitary beacon extending its welcome light in the midst of a troublous sea, like a restful oasis in the midst of a scorching desert, like an inviting hospice in the midst of Alpine snow and ice, such a refuge holds for the worn and weary, for the heart bowed down, a consoling atmosphere of repose, consolation and hope, where high and low, rich and poor, the pampered and the outcast may within its placid portals linger, to revive a loving memory, to indulge an ardent hope, and amidst its solace and peace recall with satisfaction the graphic and eternal thought of Edmund Burke, on the grave of his son,

"What shadows we are, and what shadows we pursue."

The decree of the learned vice-chancellor should be affirmed.

I am advised that Justices Kalisch and Black and Judge VanBuskirk concur in these views.

*For affirmance*—MINTURN, KALISCH, BLACK, VAN BUSKIRK, JJ.  4

*For reversal*—THE CHIEF-JUSTICE, KATZENBACH, CAMPBELL, WHITE, McGLENNON, HETFIELD, JJ.  6.