[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 364 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 365 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 366 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 367 
Annie Ely Parker, late of Freehold, Monmouth County, New Jersey, died March 16, 1931, seized of real and personal property valued as of that date at $77,867.74. She left a will dated January 18, 1924, and a codicil thereto dated November 12, 1929. They were admitted to probate by the Surrogate of Monmouth County on April 7, 1931. The complainants Edmund J. Parker and E. Ely Parker are named as executors of said will. They are also referred to in the will as "executors or trustees" and there are several bequests of money "to my executors in trust." The executors duly qualified as such upon the probate of the will and have acted in that capacity, or as trustees, since that date, but no account of their administration of the estate has been filed.
By the Twelfth paragraph of her will, the testatrix provided as follows:
"Twelth — I direct Fifty Thousand Dollars of my estate to be put in the Fidelity Trust Company of Newark New Jersey to be held in trust for Edmund J. and E. Ely Parker share and share alike. They to have the proceeds semi-annually. In case of the death of one the survivor to have the full benefit. Except in case there be legal issue, They to have the full amount of the Fathers Trust fund, also that of the Uncles should he leave no lawful issue — When Child or Children reach the age of twenty-five years, the principal shall be paid to the Child or Children share and share alike. The remainder of my estate both real and personal I give my two sons share and share alike."
By a note on the margin of the third page of the codicil testatrix provided as follows: *Page 368 
"Bequest Twelth of Fifty Thousand Dollars — In case there are no Child or Children The proceeds from the $50,000 to be used for Greenlawn Cemetery and The Monmouth Co. Tuberculosis Hospital, and the sum of One Hundred dollars, as a Xmas Gift annually to Annie P. Rue, for life."
The proofs show that Annie P. Rue is dead.
Pursuant to paragraph "Twelfth" of the will the executors have deposited with The Fidelity Union Trust Company the sum of $28,000.
On January 12, 1943, in proceedings in the Monmouth County Orphans' Court instituted by The Fidelity Union Trust Company claiming to be acting as trustees under decedent's will, the complainants as executors and trustees were cited to file an account.
On November 13, 1943, the executors filed their bill in this court against The Fidelity Union Trust Company and the County of Monmouth seeking a construction of the above quoted paragraphs of the will, restraint of the proceeding in the Monmouth County Orphans' Court, and a decree directing the Trust Company to account for the $28,000 deposited with it by the executors, and to transfer and turn over to complainants any investments and accumulated income in its hands resulting from that fund; adjudicating that the Trust Company is not a trustee under said will; that testatrix died intestate as to the $50,000 mentioned in paragraph "Twelfth" of the will; that said fund is the absolute property of complainants as next of kin of testatrix, and that the County of Monmouth has no interest in said fund.
On the same day complainants filed a petition under the provisions of R.S. 2:26-71, subsection C, seeking a decree declaratory of the rights of the parties complainant and defendant to the bill of complaint above mentioned and restraintpendente lite against any proceedings in the Monmouth County Orphans' Court respecting the administration of decedent's estate. An order to show cause with preliminary restraint thereupon issued and on the return day thereof a further order was advised directing the complainants to amend their bill in order to bring before the court for construction the entire will of testatrix and to add as parties to this proceeding all persons, firms or corporations mentioned as legatees, devisees or otherwise in *Page 369 
said will, or who may have or claim an interest in decedent's estate. And all parties (including the complainants) were thereby restrained pendente lite from further proceedings in the Orphans' Court, the rights of all interested parties to file exceptions to any account of the complainants as executors or trustees being in the meantime expressly reserved.
Pursuant to that order an amended bill of complaint was thereafter filed and all parties appearing to have any interest under testatrix' will have been made parties thereto.
For a clear understanding of the issues involved in the construction of this will and codicil, a copy thereof is herein set forth as follows:
"IN THE NAME OF GOD, AMEN.
"I, Annie Ely Parker, of the Borough of Freehold and County of Monmouth, and State of New Jersey; do hereby make, and publish, and declare: the folling to be my last will and testament.
"FIRST. I direct that all my just debts and funeral expenses be paid by my Executors hereinafter named; as soon as can be conveniently done after my decease.
"SECOND. I give and bequeath to my Executors, the sum of Five Thousand Dollars in trust, that the said sum, shall be by them invested in securities; which are legal investments, in New Jersey; and the income thereof, shall be paid to the proper persons, or Corporation; for the purpose of maintaining a free bed in the Monmouth County Tubercular Hospital; as a Memorial to my Daughter (now deceased) Marie Parker Palmer.
"THIRD. I give and bequeath — my Executors the sum of Two Thousand Dollars in trust, for the Presbyterian Church, of Freehold New Jersey, the income of which said sum shall be applied as follows: (A) So much thereof shall be the regular rent for Pew No. 78. in said Church. (B) The sum of Twenty dollars ($20.00) yearly for floral decorations in Memory of the deceased members of my family. (c) The balance of said yearly income I bequeath to the Womans Aid society of said Church. I further give outright the sum of Two Thousand dollars; for a Memoral Clock to be placed in the tower of the Presbyterian Church, of Freehold New Jersey — or a Memoral Window, as my Executors may decide for the members of James Smith Parkers family.
"FOURTH. I give and bequeath to my Executors in trust, One seventy-five foot front, lot situated on Brinckerhoff Avenue for a site for a Christian Science Church; provided said lots are sold, prior to my decease, the equivelent of said lot, be given for a like purpose; if said Church be erected within two years after my decease; in the western part of the town of Freehold New Jersey — The income of said lot or amount; to be given my Executors in the lapse of time between. *Page 370 
"FIFTH. I give and bequeath to each The Cecilian Club; and Womans Club of Freehold, New Jersey One Hundred Dollars.
"SIXTH. I give and bequeath to my nieces Lydia Reid Parker, Cornelia Bown Parker, Ellen White Parker, six sterling silver soup spoons six Teaspoons; six butter spreaders (Lily Pattern) Also my wardrobe, except what may be given as specific legacies which will be found in a sealed envelope in my private drawer of my Safe.
"SEVENTH. I further give and bequeath my friend Dena Clayton One Hundred Dollars.
"EIGHT. I give and bequeath my sons Edmund J. Parker and E. Ely Parker, each one of a pair of Dimond Earrings, also the balance of my jewelery. Dimonds and Silverware, to be divided equally between them. Further I give and bequeath to my sons Edmund J. Parker and E. Ely Parker Ten Thousand Dollars each within one year after my decease.
"NINTH. I also direct that all conveyances of Real Estate, be made as Trustees of Annie E. Parkers estate, however I appoint my two sons above mentioned to be the Executors of this will; and empower them the right to sell any or all of my Real Estate or Personal property, whenever it shall in their opinion proper to do so.
"TENTH. Should Edmund J. Parker or E. Ely Parker die without legal issue, or at the death of either. I appoint the Fidelity Trust Company of Newark New Jersey as Coexecutors; or upon death of both Sole Executor.
"ELEVENTH. I further direct my Executors or Trustees to erect a suitable house as a residence for a caretaker for Greenlawn Cemetery to coast not less than Three Thousand dollars or more than Ten Thousand dollars, within three years after my decease, unless said Cemetery has been sold.
"TWELTH. I direct Fifty Thousand Dollars of my estate to be put in the Fidelity Trust Company of Newark New Jersey — to be held in trust for Edmund J. and E. Ely Parker share and share alike. They to have the proceeds semi-annually. In case of the death of one the survivor to have the full benefit. Except in case there be legal issue — They to have the full amount of the Fathers Trust fund, also that of the Uncles should he leave no lawful issue — When Child or Children reach the age of twenty-five years, the principal shall be paid to the Child or Children share and share alike. The remainder of my estate both real and personal I give my two sons share and share alike.
"IN WITNESS WHEREOF, I have hereto set my hand and seal the Eighteenth day of January, Nineteen Hundred and Twenty-four."
 — — — — — — — — — —
"IN THE NAME OF GOD, AMEN.
"I, Annie E. Parker of the Borough of Freehold in the County of Monmouth State of New Jersey, do make publish and declare this to be a Codicil to my last will and Testament as follows.
"FIRST. I revoke bequest Fourth in my Will for a Lot on Brinckerhoff Avenue as a site for a Christian Science Church and give One *Page 371 
Thousand Dollars ($1000) to be held in Trust, by Executors or Trustees until such time as a Christian Science Church, be built in Freehold New Jersey. In the meantime my Executors or Trustees to have the income therefrom.
("Writing on margin before signing. Annie E. Parker")
"Bequest Twelth of Fifty Thousand Dollars — In case there are no Child or Children The proceeds from the $50,000 to be used for Greenlawn Cemetery and the Monmouth Co. Tuberlousis Hospital, and the sum of One Hundred Dollars, as a Xmas gift annually to Annie P. Rue, for life."
"I hereby ratify my said will in all other respects.
"SECOND. Should E. Ely Parker wish to continue to occupy 22 Brinckerhoff Avenue, as his Home it is not be sold, either the furnishings therein, until two years after my decease, Edmund J. Parker to have like personal priveledges. Should either my Sons desire to purchase said residence I approve of such acquisition at a price not exceeding its assessed valuation.
"THIRD. Should Edmund J. Parker and E. Ely Parker predecease me leaving no lawful issue, my entire estate both real and personal I direct to be sold by the Union Fidelity Trust Company of Newark New Jersey, and held in Trust, the income to be divided equally between The surviving children of Henry William Parker, The First Presbyterian Church of Freehold for its upkeep and not for the Pastors salery, Greenlawn Cemetery for its upkeep and beautifying — The Home of the Aged at Ocean Grove New Jersey The Freehold Fire Department, and Elizabeth White, Daughter of James S. White and Ellen S. Conover. At the death of the person herein named, their portion to be divided among the other bequests herein named.
"FOURTH. I relieve my Executors or Trustees of the obligation of giving any bond or securety and waiving and dispensing, with the necessity of compliance of any and all statutory requirements otherwise applicable with regard to the giving of such bond or security. I also authorize my Executors, and Trustees, to hold any investments made by me in my lifetime even though they may be of a character not conforming with the legal requirements as to the investments of trust funds. My Executors or Trustees are exempted of any and all liabilities to which they might otherwise be subjected because of any losses or diminution in value of such securities of property that may result from their failure to dispose of the same.
"IN WITNESS WHEREOF, I have hereunto set my hand and seal this 12th of November 1929."
"ANNIE ELY PARKER (SEAL)
 — — — — — — — — — — *Page 372 
The bill alleges that the trust fund mentioned in paragraph "Second" of the will "has not been set up and the income therefrom has not been paid." This is admitted in the answer of the County of Monmouth but the county nevertheless claims the benefits of that fund.
The bill also alleges that the executors have not set up the trust fund mentioned in paragraph "Third" of the will, but that "they have, however, paid the rent for pew number 78 for all of the years since the testatrix died," and that "The Presbyterian Church of Freehold refused to accept this bequest of two thousand dollars" for a memorial clock or memorial window. The church, by its answer, admits these allegations of the bill, except that the present board of trustees disclaims any knowledge of the alleged refusal to accept the "outright" bequest of $2000, and offers "to confer with the executors regarding said bequest." The proofs show that nothing was ever done by the executors about this "outright" bequest of $2,000. except that one of them spoke to Mr. Alex Moreau, whom he describes as "the leading spirit in the Presbyterian Church," and he "said he would not have a clock or a window, and that is all we ever did."
The "Fourth" paragraph of the will and the "First" paragraph of the codicil must be read together.
The bill alleges that "The Christian Science Church has been established in the western part of Freehold and the Executors have paid six hundred dollars, or sixty per cent. of the one thousand dollar legacy." This allegation is admitted by the answer of the defendant First Church of Christ Scientist.
As to paragraph "Fifth" of the will, the bill alleges that "The Executors have paid to the Cecilian Club sixty per cent or sixty dollars. The Woman's Club of Freehold has refused to accept sixty dollars tendered to them."
The defendant Cecilian Club has not answered and a decree proconfesso has been entered against it. The Womans Club of Freehold has answered and admits its refusal as alleged.
The bill alleges that "the executors have made delivery of the articles specified in paragraph `Sixth.'" It appears that Cornelia Bown Parker and Ellen White Parker are dead and their *Page 373 
executors, Lydia Reed Parker and James A. Parker, are made parties defendant to this suit. Neither they nor Lydia Reed Parker have answered and a decree pro confesso has been entered against them.
By the "Seventh" paragraph of her will testatrix gave to her friend, Dena Clayton, the sum of One Hundred Dollars. The bill alleges that "the executors have paid to Dena Clayton sixty dollars, or sixty per cent," of this legacy and this is admitted in her answer.
As to paragraph "Eight" of the will, the bill alleges that "the executors have divided the jewelry and silverware between themselves, pursuant to said paragraph. They have not paid to themselves, as individuals, each, the sum of ten thousand dollars." They, as individuals, are made parties defendant to this suit, but have not answered and a decree pro confesso has been entered against them.
By the "Ninth" paragraph of her will testatrix appointed her said two sons as executors of her will and gave them full power of sale of both real and personal property but directed that all conveyances of real estate should be by them "as trustees of Annie E. Parker's Estate."
As to the "Eleventh" paragraph of the will, the bill alleges that all the cemetery lots were sold to Maplewood Cemetery Association within three years of testatrix' death. But the proofs show that these lots were conveyed by the executors by deed dated October 11, 1934, three years, six months and twenty-five days after her death, and recorded October 31, 1934.
Greenlawn Cemetery Association has not answered and a decreepro confesso has been entered against it.
The Maplewood Cemetery Association has answered and admits this allegation but claims to have succeeded to all of the rights of the Greenlawn Cemetery under testatrix' will. The evidence shows that the Maplewood Association also assumed the obligations of the executors under paragraph "Eleventh."
With respect to paragraph "Twelfth" of testatrix' will and the modification thereof as contained in the marginal note in *Page 374 
the codicil, the bill alleges that "the executors have put twenty-eight thousand dollars of the fifty thousand dollars in the Fidelity Union Trust Company." That company by its answer admits this allegation, but further says that said sum consisted of cash and mortgages which it received "as trustee under paragraph twelve of said will."
Complainants also allege that testatrix died intestate as to the corpus of the $50,000 mentioned in paragraph "Twelfth" of her will but that said sum was bequeathed to complainants as executors and trustees with directions to deposit same in the Fidelity Trust Company, but did not constitute said company trustee thereof and they, as individuals, claim to be entitled to the corpus as next of kin of the decedent. These allegations and claims are denied by the defendant Trust Company which claims that because the full sum of $50,000 had not been paid to it by the executors, it has endeavored for a number of years to induce them to file their account as such executors and, failing in these efforts, finally instituted proceedings in the Monmouth County Orphans' Court to compel such accounting. The issues touching this fund are the most important and troublesome in this controversy. Complainants claim that they are trustees of decedent's entire estate "having been clothed with the responsibility of trustees by the second, third and fourth paragraphs of her will, and having been designated as executors or trustees, in the eleventh paragraph of her will and the fourth paragraph of the codicil." Also that by the "Twelfth" paragraph of said will testatrix directed them "to deposit fifty thousand dollars in securities for safe keeping in the Fidelity Trust Company" and the title to the said $50,000 has never passed out of them. They deny that the County of Monmouth has any interest in this fund under the marginal note in the codicil to testatrix' will or under any provision of the will or codicil.
At the final hearing the evidence showed that testatrix' sons, Edmund J. Parker and E. Ely Parker, were living, unmarried, had no issue, and were both of an age exceeding the allotted three score and ten. *Page 375 
The Green Lawn Cemetery Association was incorporated, or a certificate of incorporation was filed and recorded in the Monmouth County Clerk's office, on January 10, 1901. The lands known as Green Lawn Cemetery comprised about 42 acres conveyed to James S. Parker, husband of testatrix, by John B. Thompson, in 1888. This land was surveyed and plotted on a map of Green Lawn Cemetery in 1889, which map was filed in the Clerk's office on May 9, 1901, but title remained in James S. Parker until 1897 when he conveyed it to his wife, the testatrix, through an intermediary. Thereafter and until 1901, she conveyed many lots out of the tract and in that year she conveyed a portion of the remaining tract to Green Lawn Cemetery Association. On the same day the Cemetery Association reconveyed all the cemetery lots to which it had acquired title to Annie E. Parker, the testatrix, by a deed reciting that said lots were to be used for purposes of sepulture only, and in accordance with rules of the Association which were set forth in the deed. That was the only deed out of the Cemetery Association recorded at Freehold, New Jersey. Thereafter the testatrix conveyed approximately 90 lots to various persons by deeds recorded in the Monmouth County Clerk's Office. Mrs. Parker died March 16, 1931. Her interest in Greenlawn Cemetery is shown by the provisions of paragraph "Eleventh" of her will, hereinabove recited, and also by paragraph "Third" and the marginal note of the codicil. Her executors conveyed the remaining cemetery lots to the Maplewood Cemetery Association by deed dated October 11, 1934, recorded October 31, 1934, more than three years after testatrix' death. The obligation of the executors to erect a suitable residence for a caretaker had then matured. By an agreement in writing dated January 15, 1942, the Maplewood Cemetery Association assumed this obligation of the executors. This agreement recites a previous agreement between the parties dated September, 1934, under the terms of which any income from the $50,000 trust fund mentioned in the "Twelfth" paragraph of testatrix' will, or of any money or securities held by the Fidelity Union Trust Company under that clause, is transferred to the Maplewood Cemetery Association "to the *Page 376 
same extent as it would have been paid to Greenlawn Cemetery." But, obviously, the executors were powerless to effect any such transfer as will be hereinafter shown. That agreement was received in evidence by consent of all parties after the final hearing. Edmund J. Parker testified that the cemetery lots conveyed to The Maplewood Cemetery Association by deed dated October 11, 1934, comprised about four acres of land valued at $500 per acre — that they were sold to the Maplewood at that price and that he personally paid the consideration by charging himself in his executor's account with that amount.
The Green Lawn Cemetery Association seems to have been not much more than an empty shell. Its incorporation, according to the proofs at the final hearing, was prompted by criticism by an officer of the Maplewood Association of testatrix' practice of conveying burial lots in property adjoining The Maplewood Cemetery, without any legal dedication of the lands for sepulture purposes, and the conduct of a cemetery business by her as an individual and not by a corporation. As already stated, a certificate of incorporation under the provisions of "An Act to authorize the incorporation of Rural Cemetery Associations and to Regulate Cemeteries," approved April 9, 1875, was filed in the office of the Monmouth County Clerk on January 10, 1901. It recited that testatrix' two sons, Edmund J. Parker and E. Ely Parker, together with their father, James S. Parker, and four other persons, had determined upon the corporate name of Green Lawn Cemetery Association, that there should be five trustees, naming them, three of whom were James S. Parker and his two sons, and dividing them into three classes to hold office for one, two and three years respectively. The certificate is signed by J.H. Widerholt, as chairman and by E.J. Parker as secretary. That is the only record of the corporation in existence, so far as is known, except for the deed from testatrix to the Association and the deed from the association to her, both of which were, according to the proofs, executed and delivered on the same day and at the only meeting of the association that was ever held. The proof is that the authorization and execution of the deed to Mrs Parker was the sole corporate act of its *Page 377 
existence. All of the incorporators and trustees named in the certificate except testatrix' sons who are executors of her will, are dead. The corporation never functioned as a cemetery association.
It seems evident that the assets of testatrix' estate were much less than the amount of the general legacies — Edmund J. Parker, the only one of the executors who took the witness stand, estimates the value of the estate at 60 per cent of the amount of the general legacies and he sought to settle some of the legacies on that basis and paid some of the legacies accordingly, but took no releases from any who were paid.
The purpose of this bill is to obtain a construction of testatrix' will and instructions for the guidance of the executors and trustees. The task thus presented may best be performed by taking up in their order the several clauses in the will and codicil and determining their validity. Whether the directions of the testatrix may be fully carried out by her executors and trustees will depend largely upon the value of the estate. Some abatement of the various bequests may be necessary but we need not concern ourselves with that problem now. The validity of the several bequests is our first problem. I shall discuss them in their order.
 1.
The first bequest is that contained in paragraph "Second" of the will — of $5000 to the executors in trust, the income thereof to be paid "to the proper persons, or corporation, for the purpose of maintaining a free bed in the Monmouth County Tubercular Hospital as a memorial," c.
On behalf of the complainants it is argued that the gift fails because there is no one eligible to receive it, and that the income on the fund, according to information received by the executors from some member of the "board of the Allenwood Hospital," would be insufficient to maintain a free bed in that institution.
The proofs show that there is a Monmouth County Tubercular Hospital at Allenwood, Monmouth County, New Jersey, maintained by the county and that the board of chosen *Page 378 
freeholders of that county is the corporation in charge thereof. There can be no doubt of the authority of that board to accept a gift of either principal or income for the purpose mentioned in this paragraph. It is expressly given in R.S. 30:9-48 andR.S. 30:9-61. No further citation of authority is necessary. Nor does it matter that the income on this fund may be insufficient, of itself, to maintain a free bed in that hospital. The income, such as it is, is directed to be used "for the purpose of maintaining a free bed." If it falls short of the required amount there is no reason why the board of freeholders should not make up the deficiency out of other available funds. So long as this income is applied to the designated purposes, the testatrix' will is obeyed and that is the only law which governs. The trust is undoubtedly a charitable use. MacKenzie v.Trustees, c., 67 N.J. Eq. 652, 665.
Confessedly the executors have not set up this trust fund. They should do so immediately. Whether or not the board of freeholders is entitled to income from the date on which this trust fund should have been set aside, and whether the executors are personally liable for any deficiency or failure of income, are questions not now before the court, but which will probably arise on accounting proceedings. The corpus of this trust fund is, of course, subject to necessary abatement due to deficiency in estate assets.
 2.
By the "Third" paragraph of testatrix' will she gave $2000 to her executors in trust to pay the income to the Presbyterian Church of Freehold for three purposes: (1) pew rent, (2) floral decorations, and (3) the balance to the Womans' Aid Society. In the same clause she made an "outright" gift of $2000 for a memorial clock or window in said church, as the executors might decide. The trust fund of $2000 has not been set up. The executors have paid the pew rent and the $20 annually for floral decorations, but they have paid nothing to the Womans' Aid Society. The "outright" gift has not been paid. The intention of testatrix was that this "outright" gift should be paid to the church and by that organization used *Page 379 
for one of the two purposes mentioned as directed by the executors. There has been no refusal to accept the money by anyone in authority.
Counsel for the executors argues that the church is not entitled to receive the $2000 for a memorial window or clock, but he does not say why. He makes no comment on the provision for the $2000 trust fund. That fund, subject to necessary abatement, should be immediately set up by the executors. The Womans' Aid Society of the church is entitled to the accrued income thereon if any, in excess of that paid to the church for pew rent and floral decorations, the amount of which is not in dispute. The "outright" gift should be paid over to the church at once, with necessary abatement, of course, unless that organization refuses to accept and apply it for the purposes mentioned by testatrix.
 3.
Paragraph "Fourth" of the will was revoked by the "First" clause of the codicil which gives $1000 to the executors to be held in trust for the Christian Science Church until such a church is built in Freehold. The proofs show that the church has been built, that $500 or $550 of the sum has been paid to the church, and that the balance is unpaid because of the alleged deficiency in assets. On the final accounting of the executors they should pay the Church of Christ Scientist of Freehold, New Jersey, whatever balance may then appear to be due.
 4.
Of the two gifts of $100 each to the Cecilian Club and Womans' Club of Freehold, only a portion of the first, $60 has been paid. On final accounting the executors should pay these legacies in full unless abatement is necessary because of a deficiency of assets.
 5.
The specific bequests of paragraph "Sixth" have been delivered and thereby the will of the testatrix as therein expressed *Page 380 
has been executed. Nothing further remains to be done by the executors.
 6.
Sixty dollars of the $100 bequeathed to Dena Clayton by paragraph "Seventh" of the will has been paid to her. The executors are instructed to pay the balance on final accounting if the assets are sufficient. If not, pro rata with other legacies of the same class.
 7.
The specific bequests of diamonds and jewelry as contained in paragraph "Eighth" of the will have been delivered. By the same paragraph each of the two sons of testatrix is given $10,000 in cash to be paid to them within one year after testatrix' death. The proofs are uncertain and somewhat conflicting as to whether these cash bequests or any portion thereof have been paid, but the validity of the gifts is not questioned. The right of the legatees to payment may abide the accounting.
 8.
By the "Ninth" clause of her will testatrix directs "that all conveyances of Real Estate be made as Trustees of Annie E. Parker's Estate." She then appoints her two sons executors and gives them power of sale. Testatrix' intention in making this direction is not clear. So far as appears by the proofs all deeds of conveyance for property of the estate have been executed by the executors as "Executors" and not as "Trustees," but the validity of none of them is in question. Undoubtedly the executors had a power of sale, and it profits us nothing to conjecture upon the meaning of the direction that conveyances of real estate be "made as Trustees," c.
 9.
Paragraph "Tenth" names the Fidelity Trust Company as substituted or co-executor in certain contingencies which have not occurred, and with it we need have no further concern. *Page 381 
 10.
Paragraph "Eleventh" contains the directions to the executors for the erection of a residence for a caretaker of Green Lawn Cemetery to cost not less than $3000 nor more than $10,000 within three years after testatrix' death, unless the "Cemetery has been sold." The "cemetery" has been sold although not until more than the three years had elapsed. Where the house was to be built is not indicated, but presumably on the cemetery property. This the executors can not do as they no longer own that property and it is quite evident that testatrix anticipated the sale which has been made. But aside from this fact, when the property was conveyed to The Maplewood Association, that association, as a part of the consideration for the conveyance, assumed the obligation of the executors, if any, to build such a house. It does not appear from the proofs that there is any person in existence for whose benefit this provision was made and who might have any standing to enforce the performance of the obligation by the executors or their grantee. It is conceivable that the provision was made for the benefit of the cemetery, and not of any individual, but whatever the obligation, it is no longer that of the executors or the estate.
 11.
By Paragraph "Twelfth" testatrix provided as follows:
"I direct Fifty Thousand Dollars of my estate to be put in The Fidelity Trust Company of Newark, New Jersey — To be held in trust for Edmund J. and E. Ely Parker share and share alike. They to have the proceeds semi-annually. (Then follow contingent provisions not now pertinent). The remainder of my estate both real and personal I give my two sons share and share alike."
By the marginal note in the codicil hereinabove referred to, she provided:
"In case there are no child or children The proceeds of the $50,000 to be used for Greenlawn Cemetery and The Monmouth Co. Tuberculosis Hospital, and the sum of One Hundred Dollars as a Xmas gift annually to Annie P. Rue for life." *Page 382 
Annie P. Rue is dead and her interest in this fund need not be considered.
Three questions touching this bequest arise:
First. Is the Fidelity Trust Company (now Fidelity Union Trust Company) the trustee of this fund or merely a depositary?
Second. What interest, if any, has the Greenlawn Cemetery in this fund and has the Maplewood Cemetery Association succeeded to Greenlawn's rights?
Third. What interest, if any, has the County of Monmouth, the corporation in charge of the Monmouth County Tuberculosis Hospital, in the fund?
These questions will be considered in the order stated.
 First.
The complainants contend: (a) that they are the trustees of this fund; (b) that the testatrix died intestate as to thecorpus of this fund under the "Second," "Third" and "Fourth" paragraphs of the will, and the "Fourth" paragraph of the codicil; (c) that they, as next of kin, are entitled to the corpus.
 (a)
It seems to me indisputable that testatrix contemplated this trust to continue beyond the lives of her two sons whom she appointed as her executors, for there is a gift over of income to their children, and of the principal upon the issue arriving at age 25. If no children, the codicil provides for payment of income to Greenlawn Cemetery and the Monmouth County Tuberculosis Hospital. Obviously the trust was to continue in existence after the sons had passed on, and yet she named no new trustee to carry on after their death.
That she would have appreciated the necessity of naming a substitute trustee in the event of their death, had she intended them to be trustees of the fund, appears conclusively to me from the fact that in paragraph "Tenth" of her will she named the Fidelity Trust Company as substitute or co-executor, in that contingency. Her failure to do so is a strong *Page 383 
indication that she had in mind the fact that she had already appointed the Fidelity Trust Company as trustee of this fund, knew that its corporate existence would continue, and that after the death of her sons it would continue to function and discharge its duties as trustee. This disposes of complainants' first contention that they are the trustees of the fund.
 (b)
If only the language of the "Twelfth" paragraph of the will were involved, the argument that testatrix died intestate as to this fund would have greater force as under that clause there is no disposition of the fund in the event of the failure of issue; but in view of the provisions of the marginal note in the codicil, the validity of which is not challenged, that difficulty is eliminated. By that note, testatrix, in effect, continues the trust if no issue survives and directs the trustees to pay the income to Greenlawn Cemetery and the Monmouth County Tubercular Hospital. Whether, in view of the ephemeral character of the Greenlawn Cemetery Association, a portion of the fund lapses and falls into the residue will be discussed later.
 (c)
Complainants' third contention that they take this fund as next of kin because of intestacy is without merit. If all or any portion of the fund lapses it falls into the residue and the residue is disposed of by the words, "The remainder of my estate both real and personal I give to my two sons share and share alike" — the concluding words of paragraph "Twelfth." If they are entitled to the fund it is as residuary legatees under this clause, and not as next of kin.
 Second.
I have concluded that Greenlawn Cemetery Association, whose existence was transient only, has no interest whatsoever in this fund. It will be noted that there is no gift to the association as such. The purpose of testatrix to completely *Page 384 
ignore the existence of any corporate entity as the owner of Greenlawn Cemetery is evident throughout the will and codicil. The business of selling cemetery lots was purely personal to testatrix, both before and after the incorporation of the cemetery association. That corporation owed its short-lived existence to the question raised by a competitor cemetery association which owned lands adjoining those owned by testatrix, as to her right to sell burial lots which were not dedicated to sepulture purposes. To meet this objection testatrix filed, or caused to be filed, the certificate of incorporation of the Greenlawn Cemetery Association, conveyed the remaining cemetery lots to it with one hand, and with the other took back a conveyance of the same lots by a deed which restricted their use to purposes of sepulture. The corporation was never completely organized, functioned but momentarily in the transaction just described and then died aborning. Its transient existence was thereafter ignored.
The will was executed in 1924, 23 years after the corporation was formed, and the codicil in 1929, 28 years after it began its short career. The effective date of the will was March 18, 1931, the date of testatrix' death. No corporate entity capable of receiving the benefit of this gift of income to Greenlawn Cemetery was in existence at that time.
On behalf of some of the parties to this suit it is argued that this bequest is valid under the provisions of R.S. 8:2-30 as amended in 1939 (N.J.S.A., 8:2-30), and, by others, that it is void because it does not come within the provisions of P.L.
1920, c. 284, p. 510, the source of R.S. 8:2-30. But neither of these statutes is pertinent to this inquiry. The 1920 act related solely to private burial lots or plots, or mausoleums, none of which are involved here. The language of that act was "for the care * * * of any cemetery lot or grave lot, the graves therein, the tombstones or monuments thereon, or of any mausoleum." Obviously, this referred to private burial lots or plots. It was so held by Vice-Chancellor Ingersoll in FirstNational Bank of Ocean City v. Rice, 101 N.J. Eq. 520. The revisors of our statutory law, in R.S. 8:2-30, altered this language to read "for the care * * * *Page 385 
of any cemetery or grave, plot or lot, the graves therein, the tombstones or monuments thereon, or a mausoleum." By what authority does not appear; but in view of P.L. 1937, c. 188,page 832, by which the statutes as revised were adopted "as all the public statute law of the state of New Jersey of a general nature," that is of no moment now. Obviously, the scope of the original statute was somewhat enlarged, and, as revised, included in its provisions the words "any cemetery," which language might conceivably apply to the Greenlawn Cemetery had the revised statute been in effect at the effective date of testatrix' will, March 16, 1931; but it was not. For the same reason the amendatory act of 1939 (N.J.S.A. 8:2-30) does not apply. We may, therefore, disregard all of these statutes, and I know of no other statute which is applicable.
If the bequest of a portion of this income was intended for the Greenlawn Cemetery Association, then the Maplewood Cemetery Association takes nothing by assignment, for the river can rise no higher than its source. As the Greenlawn Cemetery Association is non-existent, and as no rights under this will ever vested in that association as such, any attempted assignment of it rights by the executors to the Maplewood Association transfers nothing. Further, the executors had no title to this fund and no power of disposition of the income therefrom.
But if this bequest of a portion of the income was intended to be used for the upkeep of the Greenlawn Cemetery, the fact that the unsold lots in that cemetery were sold in bulk to the Maplewood Cemetery Association ought not defeat the gift. The question then arises, is this a gift of income for a charitable purpose, and, if so, is it void for indefiniteness?
I do not think it can be said to be void for indefiniteness,Noice v. Schnell, 101 N.J. Eq. 252. And we need not attempt to define a charity here — reference to the opinion of Mr. Justice Katzenbach, speaking for the Court of Errors and Appeals in Noice v. Schnell, supra, wherein he reviewed the cases and recited numerous definitions of a charity as *Page 386 
enunciated by various courts of the United States and of England, will suffice. In applying the language of these courts to the instant case, these facts must be considered: In 1889, long prior to the incorporation of the Greenlawn Cemetery Association, the cemetery lands had been surveyed and plotted on a map entitled "Greenlawn Cemetery," and that map was filed in the Monmouth County Clerk's Office on May 9, 1901, shortly after a certificate of incorporation had been filed. The intention to dedicate these lands to burial purposes is obvious. The filed map showed three hundred 35 burial lots or plots. Many of these lots had been conveyed by testatrix by reference to the map prior to the incorporation of the association and the conveyances in and out of it, in 1901. Thereafter many lots (deeds for 90 are recorded) were conveyed by testatrix to individual purchasers, many of whose bodies are now interred therein. It is evident that the testatrix assumed that the necessary dedication of these lots was accomplished by the deeds in and out of the Association and by the filing of the map of Greenlawn Cemetery. The lands thus surveyed, plotted, mapped and sold have since been used exclusively as a public cemetery and for purposes of sepulture only. For over 30 years testatrix had been engaged in the business of developing, embellishing and beautifying the cemetery and selling lots therefrom; hundreds of such lots were sold to various persons and in many of them interments had been made when she executed her will.
In my judgment there was an effective dedication of the lands to such purposes. Van Buskirk v. Standard Oil Co.,94 N.J. Eq. 686 (reversed on other grounds, 100 N.J. Eq. 301.) See also Wormley v. Wormley, 207 Ill. 411, 69 N.E. 865, 3L.R.A. (N.S.) 481; Davidson v. Reed, 111 Ill. 167,53 Am.Rep. 613. No particular form or ceremony is necessary to effect a dedication of land for cemetery purposes. Evidence of intent to dedicate is sufficient and there is an abundance of such evidence here.
The proceeds of sales of the lots in this cemetery had been pocketed by testatrix and, so far as appears from the proofs, no provision was made for the upkeep of the lots *Page 387 
so sold. During her lifetime she attended to the upkeep of the cemetery herself, but it is evident that she was also concerned with its maintenance after her death. Her interest in such upkeep and maintenance is shown by the provision in paragraph "Eleventh" of her will for the erection of a residence for a caretaker at a cost of from $3,000 to $10,000. It is obvious that so long as the property was under her control, or that of her executors, it was her wish that a caretaker be constantly in attendance on the property. Five years later, when she executed the codicil to her will, her continued interest in the upkeep of the cemetery property is evident from the provision therein that a portion of the income from the $50,000 trust fund "be used for Greenlawn Cemetery," and the naming of the cemetery as one of the contingent beneficiaries of her whole estate in paragraph "Third" thereof. Perhaps she realized that she owed some obligation to her vendees of cemetery lots to provide for their upkeep, and that she owed some duty to the public to maintain the cemetery property as a whole in a manner which would do credit to the community. If the provision for the use of this income "for Greenlawn Cemetery" resulted from this mental attitude, or from whatever motive, it was obviously intended for the public "benefit, utility or ornament." 2 Perry Trusts (5th ed.) 314. So considered, the object of the gift is charitable and the gift, therefore, valid. There can be no doubt as to testatrix' intention. Why should it not be given effect?
This bequest is distinguishable from those of which that involved in Hilliard v. Parker, 76 N.J. Eq. 447 is an example, in that they were bequests for the upkeep of private burial lots or plots, whereas this is a bequest of income for the embellishment and upkeep of a public cemetery. Bequests for such purposes are uniformly held to be charitable and not void as violative of the rule against perpetuities. 14 C.J.S., p. 442,par. 14; 10 Am. Jur. p. 636, par. 74; Stockton v. Newark,42 N.J. Eq. 531 (reversed on other grounds 44 N.J. Eq. 178);Corin v. Glenwood Cemetery, 69 Atl. 1083; Bliss v. LindenCemetery Association, 81 N.J. Eq. 394; Atlas Fence *Page 388 Company v. West Ridgelawn Cemetery, 110 N.J. Eq. 580; VanBuskirk v. Standard Oil Co., 94 N.J. Eq. 686 (reversed on other grounds, 100 N.J. Eq. 301).
The text in 14 C.J.S., page 442, reads as follows:
"A gift for the care, maintenance or improvement of a public or semi-public burial ground * * * is charitable in nature."
This doctrine extends to a burial ground in connection with a church or religious society; a public burial ground or one for all persons of a certain class, race or neighborhood. The same doctrine is similarly expressed in 10 Am. Jur. supra, and the rule has long been recognized in this State. In Corin v.Glenwood Cemetery, supra, Vice-Chancellor Stevens said:
"Ground devoted to the burial of the dead was once deemed to be devoted to a pious use * * * and is now in this state held to be subject to a charitable use." Citing Newark v. Stockton,44 N.J. Eq. 179.
In Stockton v. Newark, supra, Chancellor Runyon said:
"If the title to the land was held * * * in trust for the purposes of the charity (use as a burial-ground) the city holds it in like manner."
It will be noted that he used the word "charity" and "use as a burial ground" interchangeably.
In Atlas Fence Company v. West Ridgelawn Cemetery, supra, Mr. Justice Parker, speaking for the Court of Errors and Appeals, said:
"That a public cemetery organized under our statute (Comp.Stat. p. 372) is a charitable use we think is clear. It is true that this court, in Attorney General v. Linden CemeteryAssociation, 85 N.J. Eq. 501, 507, reserved its opinion on the point, which the late Vice-Chancellor Howell in the same case, had expressly decided (Bliss v. Linden Cemetery Association,81 N.J. Eq. 394, 396), and the late Vice-Chancellor Stevens had twice suggested. Corin v. Glenwood Cemetery,69 Atl. Rep. 1083 (not officially reported); East Ridgelawn Cemetery Co. v.Frank, 77 N.J. Eq. 36. In the `Old Burying Ground' Case,Stockton v. Mayor, c., of Newark, 42 N.J. Eq. 531, Chancellor Runyon held that there was a charitable trust; and on appeal, this court, while reversing the decree, took occasion to express its entire concurrence in that view. 44 N.J. Eq. 178,183. We can not perceive any substantial difference in the use, between a public burying ground conveyed *Page 389 
for burial purposes to a municipality, and a burying ground owned and operated by a cemetery corporation under our statute."
Nor can I see any substantial difference in the use, between a burying ground owned and operated by a cemetery corporation organized under our statute, and one owned and operated by an individual, especially where the lands have been effectually dedicated to burial purposes only and so used for many years, because, as Vice-Chancellor Stevens said, in Corin v. GlenwoodCemetery, supra, "it is the use, and not the persons who administer it, that affords the test of charity." Reference to the context of the opinion in which this statement appears shows clearly that by "persons who administer" he meant those who manage and operate the cemetery, be they municipalities, corporations or individuals. It is because, as Vice-Chancellor Van Fleet expressed it in Moore's Executors v. Moore,50 N.J. Eq. 554, 558, "The place where the dead are buried is * * * hallowed ground"; or as Chancellor Runyon said in Stockton v.Newark, supra, "The burying ground is God's acre" and the lands are dedicated "to uses of the most sacred character" that the use thereof is considered a charitable use. Further sentimental reasons for holding the use of lands as a public burial ground to be a charitable use may be found admirably expressed in the dissenting opinion of the late Justice Minturn in Van Buskirk v.Standard Oil Co., 100 N.J. Eq. 301, at page 313.
It has been suggested in the briefs of some counsel that only a cemetery operated by a cemetery association organized under our statute can be the subject of a charitable use and that AtlasFence Co. v. West Ridgelawn Cemetery, supra, so holds; but with this statement I do not agree. It is true that that case, Corinv. Glenwood Cemetery and Attorney General v. Linden CemeteryAssociation, supra, all deal with cemeteries owned by incorporated associations. It is also true that testatrix' business of selling cemetery lots was a private enterprise, but this was not without precedent in Monmouth County. See West LongBranch v. Home Building, c., Co., 99 N.J. Eq. 738. There is no magic in corporate entity, and corporate form does not clothe a cemetery with the mantle of *Page 390 
charity. "It is the use," and not the parties who supervise that use, "that affords the test of charity."
In Toppin v. Moriarty, 59 N.J. Eq. 115, title to a cemetery was vested in a Bishop of the Catholic Church who, through an agent (secretary), issued certificates to so-called lot owners, entitling them to use the lot designated therein for burial purposes only, subject to regulations of the cemetery and rules of the Catholic Church. It was held that "the use is a charitable use." Citing Newark v. Stockton, 44 N.J. Eq. 180.
In Atlas Fence Co. v. West Ridgelawn Cemetery, supra, atpage 593, Mr. Justice Parker, after referring to the statutes authorizing cemetery associations to accept gifts or legacies in trust, and referring to New Jersey decisions involving those statutes, said:
"These cases, because of the statute, are naturally not determinative of the question of charitable use; but it may well be considered that unless the Legislature had regarded a public cemetery as a charitable use it would not have authorized it, as it did, to receive general gifts in perpetuity for its general maintenance as a cemetery."
From these decisions it would appear that this suggestion is without merit.
"The law contemplates two classes of cemeteries, public and private. The former class is used by the general community, or neighborhood, or church, while the latter is used only by a family or a small portion of a community." 14 C.J.S., page 63,par. 1. The only question, therefore, is whether or not this is a public, as distinguished from a private, cemetery, and as to that I am not in doubt. In all of the New Jersey cases to which I have referred, it has either been assumed or expressly held that the cemeteries involved were public burial grounds, irrespective of who held title, and the cases in other jurisdictions to the same effect are legion. The test is public user. In Davie v.Rochester Cemetery Association, 23 Atl. (2d) 377, the Supreme Court of New Hampshire held that a cemetery, though maintained by a private corporation, may fairly be deemed a public burying ground if "it is open, under reasonable regulations, to the use of the public for the burial of the dead." *Page 391 
In Starr Burying Ground Association v. North Lane CemeteryAssociation, 58 Atl. 467, Justice Hammersley, speaking for the Supreme Court of Errors of Connecticut, said:
"The burial or other safe disposition of the dead is a necessity essential to the preservation of the health of the living. The private use of land for this purpose by a private corporation may be a public convenience and necessity, as that term is sometimes used although not strictly a public use justifying condemnation of land for that purpose * * * but where land is appropriated for a burying ground by a town or other municipal corporation or by owners of the land, being a voluntary association or private corporation, and the land so appropriated is open, under reasonable regulations, to the use of the public for the burial of the dead, it may become a public burial ground, and its use a public use, and the Legislature may lawfully condemn land for that public use." (Italics mine.)
And in Evergreen Cemetery Association v. Beecher,53 Conn. 551, 5 Atl. 353, Justice Pardee speaking for the same court said:
"In order to secure for burial-places, during a period extending indefinitely into the future, that degree of care universally demanded, the Legislature permits associations to exist, with power to discharge, in behalf and for the benefit of the public, the duty of providing, maintaining and protecting them. The use of land by them for this purpose does not cease to be a public use because they require varying sums for rights to bury in different localities; not even if the cost of the right is the practical exclusion of some. * * * As a rule, men are not allowed to ride in cars, or pass along turnpikes, or cross toll bridges, or have grain ground at the mill, without making compensation. One man asks and pays for a single seat in a car, and another for a special train. All have rights. Each pays in proportion to his use. And some are excluded because of their inability to pay for any use. Nevertheless, it remains a public use as long as all persons have the same measure of right for the same measure of money."
In this respect public cemeteries are analogous to railroads and other public utilities. Here lots were sold to the public generally on the same plan in vogue with statutory cemetery associations and all persons had "the same measure of right for the same measure of money." The land has for more than 40 years been devoted to the purposes for which it was dedicated and I have no hesitancy in saying that this "God's acre" is as much a public cemetery as it would have *Page 392 
been if owned and operated by a cemetery association incorporated under our statute.
 Third.
We come now to the question as to what interest, if any, the County of Monmouth has in the income from the trust fund.
As already shown, there is a Monmouth County Tuberculosis Hospital located at Allenwood, Monmouth County, New Jersey, owned and operated by that county, and the board of chosen freeholders is the "proper corporation" in charge thereof. I have no doubt as to the validity of this gift and it will be sustained for the reasons stated above in support of the validity of the bequest "for the purpose of maintaining a free bed" in said hospital, as contained in paragraph "Second" of the will.
The gift of the corpus of this trust is to a corporate trustee, capable of accepting, and qualified to administer it. In the administration thereof the trustee will be guided by testatrix' expressed intention which is the law of this case.
Paragraph "Third" of the codicil is, of course, inoperative as the contingency upon which it was dependent did not happen, and no issue is raised touching the construction of paragraph "Fourth".
I will advise a decree in accordance with these conclusions.
(NOTE: This opinion, filed November 17, 1944, was originally marked "Not for print in any report," but is now published by direction of the Chief Justice, in response to requests from members of the Bar.) *Page 393